IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

ALBERT YARBROUGH,

    Petitioner,

vs.

TONY PARKER,

    Respondent.

No. 05-2818-B/P

ORDER GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS
ORDER CORRECTING THE DOCKET
ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

Petitioner Albert Yarbrough, Tennessee Department of Correction prisoner number 131298, an inmate at the Northwest Correctional Complex ("NWCX") in Tiptonville, Tennessee, filed a pro se petition pursuant to 28 U.S.C. § 2254 on October 13, 2005, along with a motion seeking leave to proceed in forma pauperis. Based on the information set forth in the petitioner's affidavit, the motion to proceed in forma pauperis is GRANTED. The Clerk shall record the respondent as NWCX warden Tony Parker.[1]

---

[1]    Although the petition lists Tennessee Attorney General Paul G. Summers as an additional respondent, the proper respondent to a habeas petition is the petitioner's custodian. See Rumsfeld v. Padilla, 124 S. Ct. 2711, 2718 (2004). The Clerk is ORDERED to remove Paul G. Summers as a party to this action.

I.  <u>STATE COURT PROCEDURAL HISTORY</u>

On or about March 26, 2001, Yarbrough was convicted following a jury trial in the Shelby County Criminal Court of rape. The trial court sentenced him to fourteen (14) years imprisonment, to be served at 100% as a violent offender. Judgment was entered on April 26, 2001. The Tennessee Court of Criminal Appeals affirmed. <u>State v. Yarbrough</u>, No. W2001-01150-CCA-R3-CD, 2002 WL 1732337 (Tenn. Crim. App. Apr. 12, 2002).

Yarbrough filed a <u>pro</u> <u>se</u> petition pursuant to the then-current version of the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-201 to -222, in the Shelby County Criminal Court on or about September 30, 2002. The postconviction court appointed counsel, and an amended petition was filed. On September 18, 2003, the postconviction court conducted an evidentiary hearing and, at the conclusion of the testimony, denied the petition. The postconviction court issued written findings of fact and conclusions of law concerning the dismissal of the petition on September 30, 2003. The Tennessee Court of Criminal Appeals affirmed the dismissal of the petition. <u>Yarbrough v. State</u>, No. W2004-00867-CCA-R3PC, 2004 WL 1813252 (Tenn. Crim. App. Aug. 13, 2004), <u>perm. app. denied</u> (Tenn. Jan. 31, 2005).

To assess the claims raised by Yarbrough in this petition, it is necessary briefly to set forth the facts, as found by the Tennessee Court of Criminal Appeals:

On April 25, 2000, the Shelby County Grand Jury returned an indictment against the defendant, Albert Yarbrough, charging him with the April 29, 1999, rape of the victim, Lisa Cunningham. At the defendant's trial, held March 20-22, 2001, the victim testified that she was walking home from a convenience store near the corner of Mississippi and Crump Boulevards in Memphis at about 3:30 a.m. on April 29, 1999, when a man she had never seen before "hopped out from behind [her]," grabbed her, and threw her into some bushes. She said that the man hit her "real hard," knocking her to the ground and one of her front teeth out of her mouth, "dived down" on top of her, and then fought to remove her clothing. She testified that she struggled and resisted for approximately twenty minutes, managing to kick him and stab him once or twice in the back with a short knife she carried in her back pocket. She said that she knew she stuck him with the knife, but "it couldn't have been very hard because he kept doing what he was doing." She stated that when she stuck him, the man said, "Oh, bitch, you—you tough, you tough, you're a tough bitch, you're a tough bitch," and twisted her arm hard, forcing her to relinquish the knife.

The victim testified that she pleaded with the man not to kill her. She said that he told her, "Shut up, bitch, just lay down and take it," and she lay back, still begging for her life. He then penetrated her with his penis. Although she did not see his penis, she could feel that he was not wearing a condom. She estimated that the actual intercourse lasted ten minutes and said that she felt the man ejaculate inside of her. After he had completed the act, the man "got up just as normal like [] nothing happened" and walked off. Because she had seen some fire trucks up the street, she got up and followed him, yelling in an effort to attract the firefighters' attention. However, when the man turned around and said, "Oh, you want to follow me, huh? Go on before I get you again," she stopped following him, ran home, and telephoned the police.

Approximately two and a half months later, the victim saw the defendant walking in the same area in which she had been attacked and immediately recognized him as the man who had raped her. She said that she flagged down a police officer, who caused the defendant to be apprehended and arrested. The victim testified that she recognized the defendant by his "puffed" eyes and his

distinctive gait, explaining that he walked with a "bounce" or a limp to his step. She later picked the defendant out of a photographic lineup, circling his photograph and writing, "This is the person that rape[d] me." The photographic spreadsheet, which included the date "7/14/99" and the victim's signature, was introduced as an exhibit and published to the jury.

The victim acknowledged that the lighting in the area where she was raped was not good, and that she had not been shown a photographic lineup until after she had recognized the defendant on the street in July. Nonetheless, she was absolutely confident that the defendant was the man who had raped her and had no doubt that she would have been able to recognize his photograph at any time. She testified that she had ample opportunity and "couldn't help but to see" the defendant in the long struggle during the attack. The victim made a positive courtroom identification of the defendant as her rapist.

Lieutenant Joe Hackney of the Memphis Police Department testified that the victim was bleeding from her mouth and had dirt and grass on her clothing and in her hair, when he responded to the call at her apartment shortly after the attack. He said she "had been obviously in a struggle." After an ambulance arrived, he went to an overgrown area "on Crump Boulevard right at the railroad tracks east of Mississippi" where he found "a trampled down area" in the middle of some high grass, consistent with the victim's account of the place where she had been attacked. Reading from the police report of the incident, Lieutenant Hackney testified that the victim described her rapist as

> A male black, five-nine, 30 to 40 years old, had on a dark blue Fed Ex shirt, light blue jeans, black hat, thin beard, clean-shaven, light complexion, offensive speech, faded hairstyle, conservative appearance, short hair, medium voice and angry demeanor.

He acknowledged that the victim's description included two different types of hairstyle, as well as information that the rapist wore a hat. He also acknowledged that the area in which the attack occurred was dark and covered with waist-high bushes and grass. He indicated, however, that the victim had been emotionally distraught at the time she provided her description of

4

the rapist, and testified that there were lights near the location where the rape occurred "up on the railroad bridge."

Margaret Aiken, a nurse clinician at the Memphis Sexual Assault Resource Center, testified that she examined the victim at 7:00 a.m. on April 29, 1999. Among the evidence she collected was a blood sample, saliva swabs, pubic hair, the victim's underpants, and vaginal swabs, the latter of which revealed the presence of sperm in the victim's vagina. Aiken testified that her standard procedure is to meticulously label, package, and place the evidence she collects into a locked storage room at the facility, from which it is then sent to the Tennessee Bureau of Investigation ("TBI") for analysis. She had no personal knowledge of the procedure used to transport evidence from the locked storage room to the TBI laboratory.

Sally DiScenza, a forensic sexual assault nurse examiner employed at the Memphis Sexual Assault Resource Center, testified that she utilized standard procedures to collect a sample of the defendant's blood for evidence on July 14, 1999. She explained that standard procedure entails taking the suspect's photograph and fingerprints and asking for identification and signature to ensure identity; drawing blood using a sterile needle and a blood collection tube; placing the blood onto a sterile blotter or "blood standard card" labeled with the suspect's name; sealing the blood standard card into an evidence envelope containing the suspect's name, the date and time, and her signature; and then sealing that envelope into a larger envelope or "master suspect kit" containing the suspect's name and her signature across the seal of the envelope. DiScenza testified that she placed the sealed master suspect kit containing the defendant's blood sample in the locked evidence room of the Memphis Sexual Assault Resource Center, from which it was then sent to the TBI. She said that someone affiliated with the Memphis Sexual Assault Resource Center and the Memphis Police Department was responsible for sending the suspect kits to the TBI for analysis, and that she had no further contact with the evidence after placing it in the locked evidence room.

Chad B. Johnson of the TBI, who was accepted by the court as an expert witness in the field of serology and DNA analysis, testified that he received, among other

evidence in the case, blood standards from the victim and the defendant and vaginal swabs and slides from the victim. He first isolated and analyzed the victim's and the defendant's DNA from their respective blood samples, developing a DNA profile for each. He then isolated a mixture of genetic material, containing sperm and epithelial cells, from the victim's vaginal slide and performed DNA analysis on the mixture. His DNA analysis revealed that the genetic material from the victim's vaginal slide was consistent with the DNA profiles of the victim and the defendant, indicating the presence of the defendant's sperm mixed with epithelial cells from the victim's vagina. Johnson testified that he used a database and program developed by the Federal Bureau of Investigation to determine that the statistical probability of someone else having the same DNA profile as the defendant was one in 130 million individuals in the African-American population, and one in 69 million individuals in the Caucasian population. On cross-examination, he testified that the evidence was shipped to him by Federal Express, and acknowledged that he had no personal knowledge of the manner in which it had been collected.

Memphis Police Department Patrol Officer Michael Tullos testified that he was driving down Crump Boulevard on the afternoon of July 7, 1999, when the victim waved him down and told him that she had been raped a couple of months earlier and had just seen the man who had raped her walking down Porter Street toward Alston. Officer Tullos said that he obtained a description of the suspect from the victim, verified through dispatch that the victim had filed a rape report, and then drove in the direction the victim indicated the suspect had gone. He said that he located the suspect one or two blocks away, detained him, and brought him back to the victim, who positively identified him as her rapist. Officer Tullos identified the defendant as the man he had arrested.

As its final witness, the State recalled Sally DiScenza to the stand, who identified the defendant as the man from whom she took blood on July 14, 1999. DiScenza revealed on cross-examination that she had placed a sample of the defendant's pubic hair in the master suspect kit, along with his blood standard card. She explained that, if she had not mentioned the pubic hair sample in her earlier testimony, it was only because she had not been asked about it. She testified that she

6

placed the blood standard and the pubic hair sample together in the same master suspect kit, sealed the envelope with evidence tape, placed her signature across the sealed label, and locked the kit in the evidence room of the Memphis Sexual Assault Resource Center.

The defendant elected not to testify and rested his case without the presentation of any proof.

State v. Yarbrough, 2002 WL 1732337, at *1-*3.

II.   PETITIONER'S FEDERAL HABEAS CLAIMS

In this federal habeas petition, Yarbrough raises the following issues:

1.   The evidence is insufficient to sustain his conviction;

2.   He is actually innocent of the noncapital enhanced sentence, which was imposed in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000);

3.   The indictment was defective; and

4.   Trial counsel rendered ineffective assistance, in violation of the Sixth Amendment.

III.  ANALYSIS OF THE MERITS

A.   Waiver and Procedural Default

Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

    (A)  the applicant has exhausted the remedies available in the courts of the State;  or

    (B)  (I)  there is an absence of available State corrective process;  or

(ii) circumstances exist that render such
process ineffective to protect the rights
of the applicant.

(2) An application for a writ of habeas corpus may be
denied on the merits, notwithstanding the failure
of the applicant to exhaust the remedies available
in the courts of the State.

Thus, a habeas petitioner must first exhaust available state
remedies before requesting relief under § 2254. E.g., Granberry v.
Greer, 481 U.S. 129, 133-34 (1987); Rose v. Lundy, 455 U.S. 509,
519 (1982); Rule 4, Rules Governing Section 2254 Cases in the
United States District Courts ("Section 2254 Rules"). A petitioner
has failed to exhaust his available state remedies if he has the
opportunity to raise his claim by any available state procedure. 28
U.S.C. § 2254©; Preiser v. Rodriquez, 411 U.S. 475, 477, 489-90
(1973).

To exhaust his state remedies, the petitioner must have
presented the very issue on which he seeks relief from the federal
courts to the courts of the state that he claims is wrongfully
confining him. Picard v. Connor, 404 U.S. 270, 275-76 (1971); Rust
v. Zent, 17 F.3d 155, 160 (6th Cir. 1994). "[A] claim for relief in
habeas corpus must include reference to a specific federal
constitutional guarantee, as well as a statement of the facts which
entitle the petitioner to relief." Gray v. Netherland, 518 U.S.
152, 162-63 (1996). "'[T]he substance of a federal habeas corpus
claim must first be presented to the state courts.'" Id. at 163
(quoting Picard, 404 U.S. at 278). A habeas petitioner does not

8

satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief." Id.

Conversely, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." Id. When a petitioner raises different factual issues under the same legal theory he is required to present each factual claim to the highest state court in order to exhaust his state remedies. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987). He has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim. Pillette, 824 F.2d at 497-98. The claims must be presented to the state courts as a matter of federal law. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982); see also Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

Moreover, the state court decision must rest primarily on federal law. Coleman v. Thompson, 501 U.S. 722, 734-35 (1991). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner ordinarily is barred by this procedural default from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977). However, the state-court decision need not explicitly address the federal claims; instead, it is enough that the petitioner's brief squarely presents the issue. Smith v. Digmon, 434 U.S. 332 (1978) (per curiam); see also Baldwin v. Reese, 541 U.S. 27, 30-32, 124 S. Ct. 1347, 1350-51 (2004) (a federal habeas claim is fairly presented to a state appellate court only if that claim appears in the petitioner's brief).

When a petitioner's claims have never been actually presented to the state courts but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted, but procedurally barred. Coleman, 501 U.S. at 752-53; Teague v. Lane, 489 U.S. 288, 297-99 (1989); Wainwright v. Sykes, 433 U.S. at 87-88; Rust, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and that he was prejudiced in order to obtain federal court review of his claim. Teague, 489 U.S. at 297-99; Wainwright v. Sykes, 433 U.S. at 87-88. Cause for

10

a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. <u>Coleman</u>, 501 U.S. at 752-53; <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. The petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995) (quoting <u>Murray</u>, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Id.</u>

The conduct of Yarbrough's postconviction proceeding was governed by the then-current version of Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-201 to -222. That act specified types of procedural default that might bar a state court from reviewing the merits of a constitutional claim. A one-year statute of limitations governed the filing of petitions. <u>Id.</u> at § 40-30-202. The statute also enunciated a standard by which state courts were to determine whether to consider the merits of post-conviction claims:

> Upon receipt of a petition in proper form, or upon
> receipt of an amended petition, the court shall examine

the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed. The order of dismissal shall set forth the court's conclusions of law.

<u>Id.</u> at § 40-30-206(f).[2]

    The Sixth Circuit has upheld the dismissal of a Tennessee prisoner's habeas petition as barred by a procedural default caused by failing to file within the Tennessee statute of limitations on postconviction relief. <u>Hannah v. Conley</u>, 49 F.3d 1193, 1194-95 (6th Cir. 1995) (construing a previous version of the Tennessee post-conviction procedure act and stating that the three year statute of limitation provision for filing post-conviction relief was "mandatory"). In this case, the prisoner's right to file any further state postconviction petition is barred by the one-year statute of limitations and, therefore, he does not have the option

---

[2]    Tenn. Code Ann. § 40-30-206 continued:

(g)   A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

    (1)   The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

    (2)   The failure to present the ground was the result of state action in violation of the federal or state constitution.

(h)   A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

of returning to state court to exhaust any claim presented in this § 2254 petition.

    B.    <u>Legal Standard for Merits Review</u>

        The standard for reviewing a habeas petitioner's constitutional claims on the merits is enunciated in 28 U.S.C. § 2254(d). That section provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This Court must determine whether the state court adjudications of the claims that were decided on the merits were either "contrary to" or an "unreasonable application of" "clearly established" federal law as determined by the United States Supreme Court. This Court must also determine whether the state court decision with respect to each issue was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding.

1.   § 2254(d)(1)

The Supreme Court has issued a series of decisions setting forth the standards for applying § 2254(d)(1).[3] In (Terry) Williams v. Taylor, 529 U.S. 362, 404 (2000), the Supreme Court emphasized that the "contrary to" and "unreasonable application of" clauses should be accorded independent meaning. A state-court decision may be found to violate the "contrary to" clause under two circumstances:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.

Id. at 405-06 (citations omitted); see also Price v. Vincent, 538 U.S. 634, 640 (2003); Lockyer v. Andrade, 538 U.S. 63, 73 (2003); Bell v. Cone, 535 U.S. 685, 694 (2002).[4] The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would

---

[3]   By contrast, there is a dearth of caselaw concerning the standards for applying § 2254(d)(2).

[4]   The Supreme Court has emphasized that this standard "does not require citation of our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (emphasis in original).

not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406; see also id. at 407 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

A federal court may grant the writ under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." Cone, 535 U.S. at 694; see also Andrade, 538 U.S. at 75; Williams, 529 U.S. at 409.[5] "[A]n unreasonable application of federal law is different from an incorrect application of federal law." Williams, 529 U.S. at 410.[6] "[A] federal habeas court

_____

[5]    Although the Supreme Court in Williams recognized, in dicta, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," 529 U.S. at 407, the Supreme Court expressed a concern that "the classification does have some problems of precision," id. at 408. The Williams Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)," id. at 408-09, and, to date, the Supreme Court has not had occasion to revisit the issue. See Williams v. Coyle, 260 F.3d 684, 699-700 (6th Cir. 2001), cert. denied, 536 U.S. 947 (2002).

[6]    See also Andrade, 538 U.S. at 75 (lower court erred by equating "objectively unreasonable" with "clear error"; "These two standards, however, are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) (holding that the lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d).");  Cone, 535 U.S. at 698-99 ("For [a habeas petitioner] to succeed . . . , he must do more than
(continued...)

making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409.[7]

Moreover, § 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." <u>Harris v. Stovall</u>, 212 F.3d 940, 944 (6th Cir. 2000). As the Sixth Circuit explained:

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

<u>Herbert v. Billy</u>, 160 F.3d 1131, 1135 (6th Cir. 1999) (citing 17A C. Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u> § 4261.1 (2d ed. Supp. 1998)); <u>see also</u> <u>Harris</u>, 212 F.3d at 944 ("It was error for the district court to rely on authority other than

---

[6]   (...continued)
show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly."); <u>Williams</u>, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

[7]   <u>See also</u> <u>Brown v. Payton</u>, 125 S. Ct. 1432, 1442 (2005) ("Even were we to assume the '"relevant state-court decision applied clearly established federal law erroneously or incorrectly,"' . . . there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'") (citations omitted).

that of the Supreme Court of the United States in its analysis under § 2254(d)."). Finally, in determining whether a rule is "clearly established," a habeas court is entitled to rely on "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

    2.   § 2254(d)(2)

      There is almost no case law about the standards for applying § 2254(d)(2), which permits federal courts to grant writs of habeas corpus where the state court's adjudication of a petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The few decisions interpreting this provision have attempted to incorporate the standards applicable to the "unreasonable application" prong of § 2254(d)(1). Thus, the Sixth Circuit stated, in an unpublished decision, that

> a federal habeas court may not grant habeas relief under § 2254(d)(2) simply because the court disagrees with a state trial court's factual determination. Such relief may only be granted if the state court's factual determination was "objectively unreasonable" in light of the evidence presented in the state court proceedings. Moreover . . . , the state court's factual determinations are entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.

Young v. Hofbauer, 52 Fed. Appx. 234, 236 (6th Cir. Dec. 2, 2002) (citing 28 U.S.C. § 2254(e)(1));[8] see also Stanley v. Lazaroff, 01-4340, 2003 WL 22290187, at *9 (6th Cir. Oct. 3, 2003); Jackson v. Holland, No. 01-5720, 2003 WL 22000285, at *7 (6th Cir. Aug. 21, 2003) ("Though the Supreme Court has not yet interpreted the 'unreasonable determination' clause of § 2254(d)(2), based upon the reasoning in Williams, it appears that a court may grant the writ if the state court's decision is based on an objectively unreasonable determination of the facts in light of the evidence presented during the state court proceeding.") (citing Torres v. Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000)).

IV.   ANALYSIS OF PETITIONER'S CLAIMS

A.   Sufficiency of the evidence (Claim 1)

In his first claim for relief, Yarbrough contends that the evidence is insufficient to support his conviction. Yarbrough raised this issue on direct appeal, and the Tennessee Court of Criminal Appeals rejected it on the merits:

> The sole issue the defendant presents on appeal is whether the evidence was sufficient to support his conviction. Specifically, he contends that the victim's identification of him is unreliable, and that the State failed to establish the proper chain of custody for introduction of the DNA evidence at trial. The State responds by arguing that the chain of custody of the DNA evidence was reasonably established, and that the jury was entitled to accredit the victim's identification of the defendant as her rapist.

---

[8]   See also Sumner v. Mata, 449 U.S. 539, 546-47 (1981) (applying presumption of correctness to factual determinations of state appellate courts).

When the sufficiency of the convicting evidence is raised as an issue on appeal, this court considers "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 . . . (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the defendant guilty of raping the victim beyond a reasonable doubt. The identity of an accused may be established by either direct evidence, circumstantial evidence, or a combination of the two. State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975). The determination of identity is a question of fact for the jury to consider based upon a consideration of all the evidence. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). With regard to the identity of an accused, "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citation omitted). Here, the victim positively and unequivocally identified the defendant as her rapist, not only at the time of his arrest, but also in the courtroom during his trial. She remained steadfast, throughout her direct and cross-examination testimony, that she had had sufficient opportunity to view her attacker during the rape, that she immediately recognized the defendant as her rapist

when she passed him on the street in July, and that she
could have recognized him at any time after the rape.
Officer Tullos testified that the victim told him, when
she flagged down his patrol car, that she had just seen
the man who had raped her. He said that the victim's
description led him to the defendant, and that when he
brought the defendant back to the victim, she affirmed
that he was the man who had attacked and raped her.
Additionally, the victim later picked the defendant out
of a photographic lineup, once again identifying him as
her rapist.

As support for his contention that the victim's
identification of him is unreliable, the defendant points
to the inconsistencies in the victim's original
description of her attacker, evidence that the area in
which she was raped was dark, and her testimony that the
night of April 29, 2000, was the first time she had ever
seen her rapist. He also observes that the victim did not
mention anything about her attacker's "puffed" eyes or
limping gait in her original statement to police. The
victim maintained throughout her testimony, however, that
she was able to see the defendant in the estimated thirty
minutes that elapsed during the attack, much of which was
spent with him facing her as he lay on top of her,
fighting to remove her clothing and penetrate her with
his penis. Moreover, she testified that there were some
street lights in the area, and that she followed the
defendant as he walked down the street after the rape,
until he turned around and threatened to "get her" again
if she did not cease following. Lieutenant Hackney
testified that, although the immediate area of the rape
was dark, there were lights on the railroad bridge near
the area in which the rape occurred. Thus, there was
evidence from which the jury could have found that the
victim had the opportunity to see her rapist, either
during or immediately after she was attacked, and from
which it could have reasonably accredited her
identification of the defendant as her rapist. See State
v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App.), perm.
to appeal denied (Tenn. 1999) ("The credible testimony of
one identification witness is sufficient to support a
conviction if the witness viewed the accused under such
circumstances as would permit a positive identification
to be made.").

As for the discrepancies in the victim's description
of the defendant on the night of the rape, and her

20

failure to report his "puffed" eyes or distinctive gait, the jury could have reasonably concluded that these inconsistencies and oversights were the result of her emotional state, rather than uncertainty about the defendant's identity. Lieutenant Hackney testified that the victim was nervous and crying at the time she gave her statement to police. In light of her distraught state, it is hardly surprising that some details of her description varied. Nor is it surprising that she neglected to mention the defendant's eyes or distinctive walk, or perhaps even failed to remember these traits, until after she had later seen the defendant walking down the street. The jury's decision to accredit testimony of a witness in spite of obvious inconsistencies will not be disturbed by this court on appeal unless those "inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt" of the defendant's guilt. Id. The defendant's presentence report, indicating that he is 5'8" in height and was 40 years old at the time of the rape, demonstrates that although the victim may have provided some inconsistent details about the defendant's hairstyle or clothing, she was remarkably accurate in other descriptive details she provided in her initial report. In sum, we conclude that the evidence cited by the defendant was insufficient to show that the victim's identification testimony was unreliable.

The defendant also contends that the State failed to establish an unbroken chain of custody for the introduction of the DNA evidence. He argues that the evidence should not have been admitted because of the State's failure to present proof of who shipped it from the evidence room at the Memphis Sexual Assault Resource Center and who received it at the TBI laboratory in Jackson. The State contends that the chain of custody was reasonably established, and that the trial court did not abuse its discretion in admitting the DNA evidence at trial. We agree with the State.

In order for tangible evidence to be presented at trial, the State must either introduce a witness who is able to identify the evidence, or establish an unbroken chain of custody. State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000) (citations omitted). The purpose of the chain of custody is "'to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" Id. (quoting State v. Braden, 867

21

S.W.2d 750, 759 (Tenn. Crim. App. 1993)). However, the
State is not required to establish facts that exclude any
possibility of tampering; reasonable, rather than
absolute, assurance as to the identity and integrity of
the evidence is all that is required. Id. (citations
omitted). Whether or not the chain of custody has been
sufficiently established lies within the sound discretion
of the trial court, and the trial court's determination
will not be reversed on appeal absent a showing of abuse
of discretion. State v. Beech, 744 S.W.2d 585, 587 (Tenn.
Crim. App. 1987); State v. Johnson, 673 S.W.2d 877, 881
(Tenn. Crim. App. 1984).

Our review reveals no abuse of discretion by the
trial court in this matter. The trial court found that
although the chain of custody could have been "done more
clearly[,]" the State's proof was sufficient to warrant
the admission of the DNA evidence at trial. We agree.
"[E]vidence may be admitted when the circumstances
surrounding the evidence reasonably establish the
identity of the evidence and its integrity." Scott, 33
S.W.3d at 760 (emphasis added) (citing State v. Holloman,
835 S.W.2d 42, 46 (Tenn. Crim. App. 1992)). Both Margaret
Aiken and Sally DiScenza testified that they followed
standard, sterile procedures in collecting the evidence
from the victim and the defendant, sealing the evidence
into envelopes, and placing the labeled and sealed
envelopes in the locked evidence room of the Memphis
Sexual Assault Resource Center. Both testified that
evidence envelopes from the locked storage room were
routinely sent to the TBI laboratory for analysis,
although neither was personally involved in the shipment
or transport of the evidence to the laboratory. Chad
Johnson testified that the evidence arrived to him at the
TBI laboratory, via Federal Express, packaged in two
separate evidence envelopes, with smaller envelopes
inside. One kit was labeled with the defendant's name,
and the other with the victim's name. Although Johnson
was never asked if the envelopes were sealed when he
received them, and as a consequence never directly
testified that they were, he indicated that the
laboratory routinely receives suspect kits from law
enforcement agencies, and that there was nothing about
these envelopes that caused him to question their origin,
packaging, or labeling. The defendant does not cite
anything in the record to suggest that the envelopes were
tampered with or altered between the time that Aiken and
DiScenza placed them in the locked evidence room and they

22

arrived at the TBI. Thus, we conclude that the circumstances establish with reasonable assurance the identity and integrity of the evidence at issue. <u>See</u> <u>id.</u> ("the State is not required to establish facts which exclude every possibility of tampering") (citing <u>State v. Ferguson</u>, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987)).

<u>State v. Yarbrough</u>, 2002 WL 17323337, at *4-*6 (alterations in original).

In this § 2254 petition, Yarbrough has apparently abandoned his argument based on the testimony of the petitioner and, instead, limits his sufficiency of the evidence objection to the DNA evidence. Yarbrough raises numerous challenges to that evidence, and it is not possible to determine, on the present record, whether each of those challenges was presented to the state courts. It is unnecessary to order a response to the petition to address this issue, however, because the opinion of the Tennessee Court of Criminal Appeals makes clear that the testimony of the victim, standing alone, is sufficient to support the guilty verdict. <u>Id.</u> at *4 ("With regard to the identity of the accused, 'the testimony of a victim, by itself, is sufficient to support a conviction.'"). For that reason alone, the petitioner's first issue is without merit.

Moreover, with respect to the objections raised about the admission of the DNA evidence, Yarbrough does not explain why the decision of the Tennessee Court of Criminal Appeals on this issue was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). This is "a run-of-

the-mill state-court decision applying the correct legal rule from
[Jackson v. Virginia, 443 U.S. 307, 324 (1979),] to the facts of a
prisoner's case" and, therefore, it "does not fit comfortably
within § 2254(d)(1)'s 'contrary to' clause." Williams v. Taylor,
529 U.S. at 406.[9]

It is not clear whether Yarbrough contends that the
decision of the Tennessee Court of Criminal Appeals was an
unreasonable application of Jackson v. Virginia. Although it can be
inferred that Yarbrough disagrees with the state-court decision,
his petition does not analyze the particular deficiencies in the
state-court decision in light of Jackson. Moreover, Yarbrough makes
no effort to demonstrate that the state-court decision is
objectively unreasonable, rather than merely incorrect. Williams,
529 U.S. at 410; see also supra p. 15 & n.6. Moreover, the
Tennessee Court of Criminal Appeals cited the correct legal
standard, see supra p. 19, and then applied that standard to the

---

[9]      In Jackson v. Virginia, 443 U.S. 307, 324 (1979), the Supreme Court
held that

> in a challenge to a state criminal conviction brought under 28
> U.S.C. § 2254—if the settled procedural prerequisites for such a
> claim have otherwise been satisfied—the applicant is entitled to
> habeas corpus relief if it is found that upon the record evidence
> adduced at the trial no rational trier of fact could have found
> proof beyond a reasonable doubt.

This standard requires a federal district court to examine the evidence in the
light most favorable to the State. Id. at 324, 326 ("a federal habeas corpus
court faced with a record of conflicting facts that supports conflicting
inferences must presume—even if it does not affirmatively appear in the
record—that the trier of fact resolved any such conflicts in favor of the
prosecution, and must defer to that resolution"). Applying those standards, the
Supreme Court rejected the petitioner's claim that there was insufficient
evidence in the record to permit a trier of fact to conclude, beyond a reasonable
doubt, that he was guilty of premeditated first-degree murder. See id. at 324-26.

arguments raised by Yarbrough about the sufficiency of the evidence, including the victim's identification of the defendant, see supra pp. 19-21, and the DNA evidence, see supra pp. 21-23.[10]

Yarbrough also does not address whether the decision of the Tennessee Court of Criminal Appeals was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing. 28 U.S.C. § 2254(d)(2). Although Yarbrough's petition lists what he perceives as deficiencies in the conditions under which the DNA evidence was stored and the chain of custody, he does not address the treatment of those issues by the state court. In particular, the state court observed that "the State is not required to establish facts that exclude any possibility of tampering; reasonable, rather than absolute, assurance as to the identity and integrity of the evidence is all that is required." State v. Yarbrough, 2002 WL

---

[10]   To the extent Yarbrough contends that the admission of the DNA evidence is contrary to Tennessee law, that claim is not cognizable in a petition pursuant to 28 U.S.C. § 2254. This Court is authorized to issue a writ of habeas corpus with respect to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Error in the application of state law is not cognizable in a federal habeas proceeding. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Pulley v. Harris, 465 U.S. 37, 41 (1984).

Even if the petition is construed as asserting a federal claim, Yarbrough has not demonstrated that he is entitled to habeas relief. He has presented no argument that the decision of the Tennessee Court of Criminal Appeals concerning the admission of the DNA evidence was contrary to, or an unreasonable application of, clearly established federal law, as required by 28 U.S.C. § 2254(d)(1). Under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), a habeas petitioner has the burden of demonstrating that trial error "'had a substantial and injurious effect or influence in determining the jury's verdict.'" As Yarbrough has not attempted to satisfy that standard, he is not entitled to habeas relief on this issue.

25

1732337, at *6. With respect to the chain of custody, the Tennessee Court of Criminal Appeals also emphasized that "[t]he defendant does not cite anything in the record to suggest that the envelopes were tampered with or altered between the time that Aiken and DiScenza placed them in the locked evidence room and they arrived at the TBI." Id. The state court therefore concluded that "the circumstances establish with reasonable assurance the identity and integrity of the evidence at issue." Id. Yarbrough has not satisfied his burden of demonstrating, by clear and convincing evidence, that the state-court's decision that sufficient evidence existed to support his conviction was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing.

Accordingly, Claim 1 is without merit and is DISMISSED.

B.   The constitutionality of the sentence (Claim 2)

In his second claim for relief, Yarbrough asserts that he is actually innocent of the noncapital enhanced sentence, which was imposed in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000). The precise nature of this issue is difficult to discern. Yarbrough first complains of multiple deficiencies in the notice of intent to seek enhancement, which the State filed pursuant to Tenn. Code Ann. § 40-35-202. Yarbrough also enumerates the manner in which his sentencing hearing, and the sentencing court's factual findings, failed to comply with Tennessee law. However, as

26

previously stated, see supra p. 25 n.10, any errors by a state court in the application of state law are not cognizable in a § 2254 petition.

Next, Yarbrough asserts that the Tennessee Sentencing Reform Act of 1989 is inconsistent with Apprendi. In particular, Yarbrough contends that the factors relied on by the sentencing judge to increase his presumptive sentence from twelve (12) years to fourteen (14) years should have been submitted to the jury and proven beyond a reasonable doubt.[11]

Yarbrough did not raise the Apprendi issue on direct appeal. He attempts to excuse this omission on the ground of ineffective assistance by trial and appellate counsel. He also asserts that he raised the issue in his postconviction petition, but postconviction counsel refused to include the issue in the appellate brief.

Yarbrough has not exhausted this issue in state court, as required by 28 U.S.C. § 2254(b)(1). Although the ineffective assistance of trial and appellate counsel may provide cause for the failure to raise the issues at the sentencing hearing and on direct appeal, that ineffective assistance claim is barred by procedural default. Edwards v. Carpenter, 529 U.S. 446 (2000). Even if

---

[11] The sentencing judge found the following enhancement factors: (I) the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range, Tenn. Code Ann. § 40-35-114(1); (ii) the defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense, id., § 40-35-114(5); and (iii) the personal injuries inflicted upon the victim was particularly great, id., § 40-35-114(6).

Yarbrough raised the matter in his postconviction petition, he concedes that the issue was not presented to the state appellate courts. See supra pp. 10-11. Because there is no right to counsel in connection with a postconviction petition, Coleman v. Thompson, 501 U.S. at 752-54, Yarbrough is not entitled to habeas relief in connection with any errors or omissions of postconviction counsel, see 28 U.S.C. § 2254(I) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). Accordingly, Yarbrough cannot rely on the purportedly ineffective assistance he received from postconviction counsel as cause to excuse his procedural default of his second claim.

The Court DISMISSES claim 2 as barred by procedural default.

C.    The allegedly defective indictment (Claim 3)

In his third claim for relief, Yarbrough asserts that the indictment was defective. Yarbrough admits that he did not raise the issue on direct appeal due to the ineffective assistance of trial and appellate counsel. He asserts that the issue was raised in his postconviction petition but postconviction counsel failed to include it in his brief to the Tennessee Court of Criminal Appeals. Accordingly, this issue is barred by procedural default for the same reasons stated supra with respect to Claim 2.

28

The Court DISMISSES claim 3 as barred by procedural default.

D.    Ineffective assistance of counsel (Claim 4)

In his fourth claim for relief, Branch contends that he received ineffective assistance of counsel, in violation of the Sixth Amendment. In particular, counsel allegedly (I) failed adequately to explain and consult with him about the facts and law; (ii) failed to pursue an alibi defense; (iii) failed to have the DNA evidence independently tested; (iv) failed adequately to challenge the DNA evidence and the pretrial identification of the defendant by the victim; (v) failed timely to inform him of the State's plea offer of eight years plea; (vi) failed to raise an Apprendi challenge to the judge's determination of the sentencing factors.

As a preliminary matter, it has already been established that issue (vi) was not raised in the appellate brief challenging the denial of the postconviction petition. See supra pp. 27-28. Accordingly, this aspect of Yarbrough's ineffective assistance claim is barred by procedural default.

Issues (i)-(v) were raised in the postconviction petition, and the Tennessee Court of Appeals rejected them on the merits. Accordingly, Yarbrough has exhausted these aspects of his ineffective assistance claim.

29

A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

30

Id. at 689 (citations omitted); see also Coe v. Bell, 161 F.3d 320, 342 (6th Cir. 1998) ("The specifics of what Coe claims an effective lawyer would have done for him are too voluminous to detail here. They also largely miss the point: just as (or more) important as what the lawyer missed is what he did not miss. That is, we focus on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement."); Adams v. Jago, 703 F.2d 978, 981 (6th Cir. 1983) ("a defendant 'has not been denied effective assistance by erroneous tactical decisions if, at the time, the decisions would have seemed reasonable to the competent trial attorney'").

    A prisoner attacking his conviction bears the burden of establishing that he suffered some prejudice from his attorney's ineffectiveness. See Lewis v. Alexander, 11 F.3d 1349, 1352 (6th Cir. 1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir. 1992). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." Strickland, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. See id. at 697.

    As previously noted, the Tennessee Court of Criminal Appeals rejected Yarbrough's ineffective assistance claim on the merits, stating as follows:

        At the evidentiary hearing, trial counsel testified that she was licensed to practice law in 1987 and was

employed by the public defender's office for fifteen years. She related that she had previously tried approximately fifty criminal cases. Trial counsel testified that upon being appointed to represent the petitioner, she filed the appropriate motions, including a motion for discovery and a motion to suppress the victim's out of court identification. Additionally, she filed the proper responses to the State's motions and challenged the chain of custody of the petitioner's DNA sample. Trial counsel testified that she spent twenty to thirty hours preparing for the petitioner's trial, not including three days of trial and several hearings on sentencing. Moreover, trial was reset numerous times while the parties awaited the results of DNA analysis.

Trial counsel testified that the petitioner was in custody when she was first appointed to represent him; however, he was subsequently released on bond. Trial counsel related that she did not learn that the petitioner had been released on bond until a subsequent court date. Trial counsel visited the petitioner in jail on three occasions and also talked with him at court appearances. She explained that once the petitioner was released on bond, it was his responsibility to contact her for appointments. According to trial counsel, the petitioner never came to the public defender's office and telephoned only twice. Nevertheless, trial counsel related that her visits with the petitioner were productive. Trial counsel stated, "We talked about the DNA at length . . . [and] I gave him copies of the DNA report and [other discovery materials]."

Trial counsel conceded that neither she nor the investigator from the public defender's office interviewed the victim in the instant case. However, trial counsel stated that she learned of the victim's allegations through the affidavit of complaint, discovery materials, and testimony at the suppression hearing. Moreover, prior to trial, the State allowed trial counsel to review and take notes from the victim's statement. Trial counsel maintained that she was not surprised by any of the victim's testimony and she questioned the victim regarding the "number of inconsistencies" in her testimony.

Regarding the theory of defense, trial counsel testified that the petitioner maintained his innocence throughout the trial process, claiming that he had never

32

seen the victim. The petitioner provided trial counsel with the names of alibi witnesses, and trial counsel and the investigator contacted these witnesses. Trial counsel subsequently learned that the results of DNA analysis of semen found on the victim matched the petitioner's DNA. Trial counsel explained to the petitioner that based upon the DNA results, an alibi defense would not likely be successful. Nevertheless, the petitioner insisted on going to trial. However, prior to trial, the petitioner decided not to present the testimony of the alibi witnesses. At trial, counsel vigorously challenged the chain of custody of the petitioner's blood samples in an attempt to attack the reliability of the DNA analysis. Trial counsel testified that because the petitioner denied having sex with the victim, she did not pursue the defense of consent. She further explained that the defense of consent would not have been successful because the victim had been beaten during the rape, resulting in the loss of teeth and bruising about the face.

When asked if she had questioned the victim on cross-examination about being a prostitute, trial counsel replied that she asked the victim about her employment. The victim responded that she was unemployed. Trial counsel then asked the victim why she was out late at night, and the victim responded that she had been to a party. Trial counsel testified that unless the victim had admitted she was a prostitute, there was no way to prove it.

Trial counsel testified that in November of 2000, the State offered the petitioner a sentence of eight years. In light of the DNA results and the victim's identification of the petitioner, trial counsel believed eight years was "a great offer." Trial counsel informed the petitioner of the State's offer two weeks later, at which time she also provided him with copies of the DNA results and discovery materials and discussed the contents of the victim's statement. Trial counsel advised the petitioner of the State's evidence, including the DNA results and the victim's identification of the petitioner. She further explained that rape was a violent offense for which the petitioner could receive a sentence of twelve to twenty years with no possibility of parole. The petitioner refused to accept the State's offer.

Trial counsel testified that the State's offer of eight years was available until jury selection. Once the

33

jury was selected, the trial court voir dired the petitioner about his refusal to accept the plea offer. Trial counsel stated that the petitioner knowingly, intelligently, and voluntarily rejected the State's offer, explaining that she and the petitioner had discussed the offer several times and the petitioner was well-advised of the facts of the case. Moreover, the petitioner had prior convictions and was familiar with the criminal justice system. According to trial counsel, the petitioner was confident that a jury would not believe the victim. "[The petitioner] was adamant from day one that he did not do this and he wanted a trial."

Donald Watkins testified that he was an inmate in the Tennessee Department of Correction, serving sentences for drug convictions and violating the Motor Vehicle Habitual Offender's Act. Prior to incarceration, Watkins had lived in Memphis where he sold drugs. Watkins related that he had known the petitioner for approximately five years and he and the petitioner were currently incarcerated at the same facility. Watkins testified that prior to the petitioner's trial, the petitioner informed him that he had been charged with raping the victim. Watkins told the petitioner that he had previously sold cocaine to the victim and the victim had offered sex in exchange for drugs. Watkins testified that he would have testified to these facts at the petitioner's trial, but he was never contacted by anyone from the public defender's office. On cross-examination, Watkins conceded that he had never seen a picture of the victim.

At the evidentiary hearing, the petitioner testified that trial counsel failed to provide adequate representation. According to the petitioner, trial counsel failed to consult with him and failed to file the proper motions. The petitioner claimed that trial counsel should have filed a motion to hire a DNA expert to refute the testimony of the State's DNA expert. The petitioner further claimed that he did not receive the results of the DNA analysis until the day of trial. The petitioner conceded that he never informed anyone about the ineffectiveness of trial counsel, but claimed that he did not know who to contact.

The petitioner testified that trial counsel advised him that rape was a Class B felony for which he could receive a sentence of twenty to thirty years incarceration without the possibility of parole. He

further acknowledged that trial counsel advised him that his prior convictions could be used to enhance his sentence. The petitioner stated that on the day of trial, counsel provided him with the results of the DNA analysis. The petitioner claimed that at that time he believed that the State's offer was twenty years. He denied that counsel informed him prior to trial of the State's offer of eight years incarceration. According to the petitioner, "[h]alfway through trial she asked me why wouldn't I take the eight. And I asked her what eight?" The petitioner stated that he might have accepted the State's offer of eight years, but he did not have adequate time to consider the offer. The petitioner claimed that he did not know that he could have pled guilty in the middle of trial.

The petitioner further testified that trial counsel did not present an adequate defense. The petitioner acknowledged that he told trial counsel that he did not rape the victim. Nevertheless, the petitioner claimed that upon receiving the DNA results, trial counsel should have insisted upon pursuing a defense of consent. However, the petitioner conceded that he never informed her that he had consensual sex with the victim. He claimed that because trial counsel believed he was guilty, it would not have made a difference. Moreover, he did not want his family to learn of the extramarital affair. The petitioner explained that he had known the victim prior to the alleged rape and she had previously performed oral sex on him.

The petitioner testified that trial counsel visited him several times in jail and they met once in the courtroom. He acknowledged that he provided trial counsel with the names of alibi witnesses, but subsequently decided not to call them to testify. He explained that he did not want them to provide false testimony. On cross-examination, the petitioner conceded that he had previously been convicted of two misdemeanors and seven felonies, including burglary, sexual offenses, assault with intent to commit murder, robbery, and aggravated kidnapping.

At the conclusion of the testimony, the post-conviction court denied the petition for post-conviction relief. Specifically, the post-conviction court found that the petitioner had been untruthful in his petition and in his testimony. The post-conviction

court found that trial counsel was effective and vigorously represented the petitioner at trial, stating, "[she] put forth the best defense she could based on the factual situation that she had to deal with. She did everything that a lawyer could have done under the facts of your case." Thereafter, the post-conviction court entered written findings of facts and conclusions of law, finding the petition to be barred by the statute of limitations and the petitioner's allegations to be without merit. The petitioner now brings this appeal challenging the denial of his petition for post-conviction relief.

. . . .

In a post-conviction proceeding, the petitioner bears the burden of proving the grounds raised in the petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Questions regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court as the trier of fact. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

On appeal, a claim of ineffective assistance of counsel presents a mixed question of law and fact subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). As such, the post-conviction court's findings of fact are entitled to a presumption of correctness unless the evidence preponderates against those findings. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, a post-conviction court's conclusions of law, such as whether counsel's performance was deficient or whether that deficiency was prejudicial, are subject to a purely de novo review with no presumption of correctness. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 . . . (1984)).

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Id. at 370.

To establish constitutionally deficient performance, the petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness. Strickland, 466 U.S. at 687-88 . . .; Burns, 6 S.W.3d at 462. Specifically, the petitioner must show that counsel's performance was not within "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694 . . .; see also Dean v. State, 59 S.W.3d 663, 667 (Tenn. 2001).

On appeal, the petitioner alleges numerous instances of ineffective assistance of trial counsel. The petitioner contends that trial counsel failed to interview the victim or other witnesses, made no effort to suppress the victim's out of court identification of the petitioner, failed to prepare the petitioner for trial, failed to inform the petitioner of the futility of an alibi defense, failed to present the testimony of Donald Watkins who would have testified that the victim was a cocaine-addicted prostitute, and failed to adequately prepare for trial. The petitioner argues that cumulatively these deficiencies gave rise to a reasonable probability that, but for trial counsel's errors, the

37

result of the proceeding would have been different. We find the petitioner's allegations to be without merit.

As previously noted, the post-conviction court found that trial counsel was effective and vigorously represented the petitioner at trial, stating that trial counsel had "put forth the best defense she could based on the factual situation she had to deal with." The post-conviction court obviously accredited the testimony of trial counsel. The record does not preponderate against those findings.

. . . .

Accordingly, we affirm the judgment of the post-conviction court.

Yarbrough v. State, 2004 WL 1813252, at *1-*6 (alterations in original).

In his petition, Yarbrough repeats the arguments that were made to the Tennessee Court of Criminal Appeals but does not analyze the state-court decision in light of the standards set forth in 28 U.S.C. § 2254(d). Thus, Yarbrough does not explain why the decision of the Tennessee Court of Criminal Appeals on this issue was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). This is "a run-of-the-mill state-court decision applying the correct legal rule from [Strickland v. Washington] to the facts of a prisoner's case" and, therefore, it "does not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams v. Taylor, 529 U.S. at 406.

It also is not clear whether Yarbrough contends that the decision of the Tennessee Court of Criminal Appeals was an unreasonable application of Strickland. Although it can be inferred

38

that Yarbrough disagrees with the state-court decision, his petition does not analyze the particular deficiencies in the state-court decision in light of <u>Strickland</u>. Moreover, Yarbrough makes no effort to demonstrate that the state-court decision is objectively unreasonable, rather than merely incorrect. <u>Williams</u>, 529 U.S. at 410; <u>see also</u> <u>supra</u> p. 15 & n.6. Furthermore, the Tennessee Court of Criminal Appeals cited the correct legal standard, <u>see</u> <u>supra</u> p. 36-37, and then applied that standard to the arguments raised by Yarbrough about his attorney's performance, <u>see</u> <u>supra</u> pp. 37-38.

Yarbrough also does not address whether the decision of the Tennessee Court of Criminal Appeals was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing. 28 U.S.C. § 2254(d)(2). Although Yarbrough's petition lists his trial counsel's purported errors and omissions, he does not address the treatment of those issues by the state court. For example, the Tennessee Court of Criminal Appeals observed that Yarbrough testified at the postconviction hearing that it was his decision not to pursue an alibi defense because he "did not want [his witnesses] to provide false testimony." <u>Yarbrough v. State</u>, 2004 WL 1813252, at *4. The state court also credited the testimony of trial counsel that she filed motions to suppress the victim's identification of the petitioner and challenged the chain of custody of the DNA sample. <u>Id.</u> at *1. The state court also rejected Yarbrough's testimony that

39

he was not timely informed of the plea offer, stating that, "[o]nce the jury was selected, the trial court voir dired the petitioner about his refusal to accept the plea offer," id. at *2, and observing that "the post-conviction court found that the petitioner had been untruthful in his petition and in his testimony," id. at *4. Yarbrough has not satisfied his burden of demonstrating, by clear and convincing evidence, that the state-court's decision on the ineffective-assistance claim was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing.

Accordingly, Claim 4 is without merit and is DISMISSED.

Because it "plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court," summary dismissal prior to service on the respondent is proper. Rule 4, Section 2254 Rules. The petition is DISMISSED.

V.   APPEAL ISSUES

The Court must also determine whether to issue a certificate of appealability ("COA"). The statute provides:

(1)   Unless a circuit justice or judge issues a
      certificate of appealability, an appeal may not be
      taken to the court of appeals from—

      (A)   the final order in a habeas corpus proceeding
            in which the detention complained of arises
            out of process issued by a State court; or

      (B)   the final order in a proceeding under section
            2255.

40

      (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

      (3)  The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253©; see also Fed. R. App. P. 22(b); Lyons v. Ohio Adult Parole Auth., 105 F.3d 1063, 1073 (6th Cir. 1997) (district judges may issue certificates of appealability under the AEDPA). No § 2255 movant may appeal without this certificate.

In Slack v. McDaniel, 529 U.S. 473, 483-84 (2000), the Supreme Court stated that § 2253 is a codification of the standard announced in Barefoot v. Estelle, 463 U.S. 880, 893 (1983), which requires a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack, 529 U.S. at 484 (quoting Barefoot, 463 U.S. at 893 & n.4).

The Supreme Court has cautioned against undue limitations on the issuance of certificates of appealability:

> [O]ur opinion in Slack held that a COA does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application of a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in Slack would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the

41

whole premise is that the prisoner "'has already failed
in that endeavor.'"

Miller-El v. Cockrell, 537 U.S. 322, 337 (2003) (quoting Barefoot,

463 U.S. at 893). Thus,

> A prisoner seeking a COA must prove "'something more
> than the absence of frivolity'" or the existence of mere
> "good faith" on his or her part. . . . We do not require
> petitioners to prove, before the issuance of a COA, that
> some jurists would grant the petition for habeas corpus.
> Indeed, a claim can be debatable even though every jurist
> of reason might agree, after the COA has been granted and
> the case has received full consideration, that petitioner
> will not prevail.

Id. at 338 (quoting Barefoot, 463 U.S. at 893); see also id. at 342

(cautioning courts against conflating their analysis of the merits

with the decision of whether to issue a COA; "The question is the

debatability of the underlying constitutional claim, not the

resolution of that debate.").[12]

In this case, there can be no question that any appeal by

this petitioner on any of the issues raised in this petition does

not deserve attention for the reasons previously stated. The Court

therefore DENIES a certificate of appealability.

The Sixth Circuit has held that the Prison Litigation

Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to

appeals of orders denying habeas petitions. Kincade v. Sparkman,

117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal in forma

---

[12]     By the same token, the Supreme Court also emphasized that "[o]ur
holding should not be misconstrued as directing that a COA always must issue."
Id. at 337. Instead, the COA requirement implements a system of "differential
treatment of those appeals deserving of attention from those that plainly do
not." Id.

pauperis in a habeas case, and thereby avoid the $255 appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). Kincade, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal in forma pauperis, the prisoner must file his motion to proceed in forma pauperis in the appellate court. See Fed. R. App. P. 24(a)(4)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter is not taken in good faith, and leave to appeal in forma pauperis is DENIED. Accordingly, if petitioner files a notice of appeal, he must also pay the full $255 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days.

IT IS SO ORDERED this 6th day of February, 2006.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

43